UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| NDIOBA NIANG and | ) | |
| TAMEKA STIGERS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:14 CV 1100 JMB |
| | ) | |
| EMILY CARROLL, *in her official capacity* | ) | |
| *as Executive Director of the Missouri Board* | ) | |
| *of Cosmetology and Barber Examiners, and* | ) | |
| WAYNE KINDLE, JACKIE CROW, | ) | |
| JOSEPH NICHOLSON, LEATA PRICE- | ) | |
| LAND, LORI BOSSERT, LINDA M. | ) | |
| BRAMBLETT, LEO D. PRICE, SR., and | ) | |
| CHRISTIE L. RODRIGUEZ, *in their* | ) | |
| *official capacities as members of the* | ) | |
| *Missouri Board of Cosmetology and Barber* | ) | |
| *Examiners,* | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER</u>[1]

### <u>Introduction</u>

In this case, the Court must evaluate the constitutionality of a Missouri law requiring

practitioners of a unique form of hair care called African Style Hair Braiding ("ASHB") to be

licensed as cosmetologists or barbers. ASHB is a distinctive form of natural hair care that

involves braiding, locking, twisting, weaving, or otherwise physically manipulating a person's

hair without the use of artificial chemicals.[2]

---

[1] This case is before the Court with the parties' consent under 28 U.S.C. § 636(c). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

[2] ASHB has cultural, historical, and racial roots in Africa, where its techniques originated many centuries ago, and were brought by Africans to this country.

Despite its differences from mainstream cosmetology or barbering, the State of Missouri nevertheless requires ASHB practitioners to become licensed in the same manner as traditional cosmetologists or barbers before they can practice their craft on the general public, for money. This means meeting the same educational, training, and testing requirements as traditional cosmetologists or barbers. The State argues that requiring licensure for these professionals serves the State's interests in promoting the public health and protecting consumers from incompetence or fraud by setting educational and testing requirements, and through inspections, as well as the prospect of licensee discipline.

Ndioba Niang and Tameka Stigers ("Plaintiffs") argue, however, that the practice of ASHB is not like traditional cosmetology or barbering; that it has a different historical and cultural genesis; and that it uses distinctive techniques. Plaintiffs contend, therefore, that it is irrational for the State of Missouri to require them to obtain a license they consider irrelevant and do not want. Plaintiffs also argue that the educational and testing requirements do nothing to promote competence in hair braiders, and that the State can protect consumers through general business licensing and general consumer protection laws, instead of licensing. Plaintiffs allege that application of the licensing regime to them violates their rights to substantive due process and equal protection, as well as their privileges or immunities under the Fourteenth Amendment.

To vindicate their rights, Plaintiffs filed this lawsuit. Plaintiffs seek declaratory relief that their constitutional rights have been violated, and injunctive relief prohibiting the State of Missouri from enforcing its licensing regimes against them. Plaintiffs also seek attorneys' fees.

After discovery in this matter was complete, the parties filed cross-motions for summary judgment. (ECF Nos. 47 and 49) Oral argument on both motions was held on January 19, 2016. Thereafter, the Court stayed this matter until the end of the 2016 Missouri Legislative session

because two bills were pending before the Missouri Legislature that might have mooted this matter. (ECF No. 57) Those bills never passed, so the Court lifted the stay. (ECF No. 62) The matter is now ripe for decision. Based on the undisputed facts of this case, and the applicable law, Defendants are entitled to summary judgment. Therefore, the Court will **GRANT** Defendants' motion for summary judgment, and **DENY** Plaintiffs' motion for summary judgment.

## I. Background

### A. Factual Background

#### 1) Plaintiffs

Plaintiffs are two individuals employed in the traditional practice of ASHB. (Plaintiffs' Statement of Uncontroverted Material Facts) ("PSOMF") (ECF No. 49-2 at ¶¶ 5, 30) [3] Plaintiffs both own and operate establishments, open to the public, for the provision of their services, for

---

[3] In its discussion of the factual background of this case, the Court will refer to either uncontroverted facts, or will construe any facts that are in genuine dispute in Plaintiffs' favor. See Ricci v. DeStefano, 557 U.S. 557, 586 (2009).

The Court notes at the outset that there is a dispute between the parties over whether Defendants have admitted items in Plaintiffs' Statement of Uncontroverted Material Facts ("PSOMF"). Plaintiffs argue that, in disputing many of their uncontroverted facts, Defendants "fail to provide any citations to record evidence indicating that those facts are controverted," and that "[t]herefore, all statements in Plaintiffs' Statement of Uncontroverted Material Facts shall be deemed admitted under Local Rule 7-4.01E." (ECF No. 54 at 2-3) This local rule requires that "[e]very memorandum in opposition [to a motion for summary judgment] include a statement of material facts as to which the party contends a genuine issue exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies." It further provides that "[a]ll matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party."

The Court need not resolve this issue. For one thing, many of Plaintiffs' statements of fact are actually legal argument, especially where they relate to issues such as the relevancy and sufficiency of the licensing regime. Furthermore, as noted above, the Court will construe any material facts that are genuinely disputed in Plaintiffs' favor.

compensation.  (Id. at ¶¶ 6, 31)  Neither Plaintiff is licensed as a cosmetologist or a barber in the State of Missouri.  (Id. at ¶¶ 4, 29)

The undisputed facts in this case demonstrate that ASHB is a unique form of natural hair care which involves braiding, locking, twisting, weaving, cornrowing, or otherwise physically manipulating a person's hair.  (Id. at ¶ 50)  ASHB is usually practiced by individuals of African or African-American descent, upon hair that is often described as "tightly textured" or "coily" hair.  (Id.)  ASHB has geographic, cultural, historical, and racial roots in Africa, where its techniques originated many centuries ago.  (Id. at ¶ 51)  Practitioners of ASHB typically do not use chemicals to artificially alter hair.  (Id. at ¶ 52)

Although the parties disagree about the extent to which ASHB is taught or learned in professional cosmetology or barbering schools, the parties agree that practitioners usually learn to perform their craft when they are children or teens, and most are "self-taught."  (Id. at ¶¶ 54, 55; ECF No. 52-1 at 20)  The parties also appear to agree that many practitioners of ASHB offer only hair-braiding services, as opposed to a wider array of services traditionally provided by full-service cosmetologists or barbers.  (PSOMF at ¶ 62; ECF No. 52-1 at 23-24)  Almost exclusively, the services offered by Plaintiffs are the intricate hair braiding that is representative of ASHB, as opposed to more traditional cosmetology or barbering services.  (PSOMF at ¶¶ 74, 75, 93, 94)

A typical customer interaction with Plaintiff Ndioba Niang begins by Niang asking customers about their past hair braiding experience; whether they have any scalp sensitivities or scalp conditions; and whether they have had any chemical hair treatments such as coloring, hair relaxing, or perm.  (Id. at ¶ 78)  Niang then examines the customer's scalp and hair prior to

performing any braiding.  (Id. at ¶ 79)  Niang does not cut or color hair, or use chemicals, heat,

or chemical relaxers to style hair.  (Id. at ¶ 80)  Niang does not wash hair.  (Id. at ¶81)

In braiding her customers' hair, Niang uses combs, brushes, hair clips, hair extensions,

scissors, lighters or candles (to seal the end of artificial hair extensions).  In the past, Niang used

flat irons, blow dryers, or hood dryers for certain braided hair styles, but she claims she does not

use those items anymore, because they are "not necessary" for ASHB services.  (Id. at ¶¶ 83-86)

Niang cleans and sanitizes the combs, brushes, and hair clips that she uses with soap and water

and/or Barbicide prior to use on each customer.  (Id. at ¶ 87)

Plaintiff Tameka Stigers provides ASHB services at an establishment in St. Louis called

"Locs of Glory".  (Id. at ¶¶ 92, 93)  Specifically, she uses a locking style known as Sisterlocks.[4]

(Id. at ¶ 93)  Locs of Glory offers a range of services, including cosmetology, barbering, and

esthetics, and employs licensed practitioners, but Stigers herself does not provide those services.

Rather, Stigers confines her practice to providing Sisterlocks services.  (Id. at ¶98-100)

In providing braiding services, Stigers uses a "hook tool," similar to a crochet hook, that

is specifically designed for Sisterlocks.  (Id. at ¶ 103)  Stigers sanitizes the hook tool multiple

times throughout the day with hand sanitizer, which is the same cleaning process used by the

licensed practitioners at Locs of Glory.  (Id. at ¶ 104)  In addition, Stigers periodically uses a hair

dryer to dry customers' hair.  Stigers also uses thread snips to help untangle customers' hair if

the hair is tangled, so that she can properly section the hair on customers' scalps for braiding.

(Id. at ¶¶ 105, 107)  Stigers also provides instructions to clients on how to maintain their

---

[4] "Sisterlocks" is a proprietary ASHB technique developed by Dr. JoAnne Cornwell, the
lead plaintiff in an important ASHB case discussed later in this opinion.  See Cornwell v.
Hamilton, 80 F. Supp.2d 1101 (S.D. Cal. 1999).  Stigers underwent additional training in this
technique in order to become a certified Sisterlocks consultant.  (PSOMF at ¶ 35, 36)

Sisterlocks at home, including instructions on how to re-tighten Sisterlocks. (Id. at ¶ 37) Stigers does not use other equipment such as flat irons, curling irons, or hood dryers. (Id. at ¶ 106)

Stigers admits that the services she provides are more complex than the basic plaits and simple braids that may be taught to students during the course of a traditional cosmetology or barbering education. (Id. at ¶ 94) Stigers does, however, sometimes provide the basic plaits and simple braid services. When she does do these simpler services, she usually performs them on children. (Id. at ¶ 95)

Plaintiff Niang avers that if she was sued for the unlicensed practice of cosmetology, she would be unable to keep her business open, and that if this lawsuit is unsuccessful, she will be forced to close her business. (ECF No. 49-58 at ¶ 35) Niang further avers that she is unable to afford to attend a licensed cosmetology or barbering school, and that even if she could afford it, she would be forced to be around what she considers to be "potentially hazardous chemicals," that she would not otherwise handle. (Id. at ¶¶ 36-38)

Plaintiff Stigers avers that if this lawsuit fails, she will be forced to spend thousands of hours and tens of thousands of dollars to attend cosmetology or barber school, or complete a 3,000 hour cosmetology or 2,000 hour barber apprenticeship in order to stay in business. Stigers states that she cannot afford this tuition, and that she might have to close her business if the licensing requirement remains. Stigers also argues that, if Missouri's licensing regime is not struck down, she will have to handle hazardous chemicals that she does not want to handle, and would not otherwise handle. (ECF No. 49-61 at ¶¶ 32-37)

### 2) <u>Missouri Licensing and Educational Regimes</u>

The State of Missouri licenses hair care professionals under two statutes—one relating to cosmetology, and the second relating to barbering. Section 329.010(5)(a) of the Missouri

Revised Statutes defines cosmetology as performing, or offering to engage in, any of the following acts:

> arranging, dressing, curling, singeing, waving, permanent waving, cleansing, cutting, bleaching, tinting, coloring or similar work upon the hair of any person by any means; or removing superfluous hair from the body of any person by means other than electricity, or any other means of arching or tinting eyebrows or tinting eyelashes…. [A]ny person who either with the person's hands or with mechanical or electrical apparatuses or appliances, or by the use of cosmetic preparations, antiseptics, tonics, lotions or creams engages for compensation in any one or any combination of the following: massaging, cleaning, stimulating, manipulating, exercising, beautifying or similar work upon the scalp, face, neck, arms or bust [is engaged in cosmetology].

The State of Missouri, through its Board of Cosmetology and Barber Examiners ("Board") construes this definition of cosmetology to include the practice of ASHB. (Doc No. 41 at ¶ 31) The Board argues that, "[b]y its nature, African-style hair braiding falls within the definition of 'cosmetology,' as it involves 'arranging, dressing, … cutting, … or similar work upon the hair of any person.'" (ECF No. 48 at 3-4) Furthermore, the Board argues that "[h]air braiding is, by its very nature, a form of hair care and styling" because it "involves the manipulation of hair for aesthetic effect." (Id. at 4)

Because the Board considers the practice of ASHB to be cosmetology, state law requires ASHB practitioners to be licensed by the State. In particular, § 329.030 provides that it is "unlawful for any person in this state to engage in the occupation of cosmetology or to operate an establishment … of cosmetology, unless such person has first obtained a license." Furthermore, Missouri law provides that the practice of cosmetology without a license is a class C misdemeanor, punishable by criminal penalties and fines of $300. See § 329.250 RSMo.[5]

---

[5] There are a few exceptions to this prohibition. First, § 329.010(4), (5) permits the unlicensed practice of cosmetology where it is done *without compensation*. Second, as will be

In order to become a licensed cosmetologist, an applicant must meet the requirements of § 329.050 RSMo., including passing a background check, satisfying an educational requirement, and sitting for an exam. In order to sit for the cosmetology exam, an applicant must satisfy the educational requirement in one of three ways: (1) graduate from a licensed school with no less than 1,500 hours of training or the equivalent credit hours, with the exception of public vocational technical schools in which a student shall complete no less than 1,220 hours; (2) complete a cosmetology apprenticeship under the supervision of a licensed cosmetologist of no less than 3,000 hours; or (3) graduate from a cosmetology school or apprenticeship program in another State which has substantially the same requirements as Missouri law. See § 329.050 RSMo.

The mandatory curriculum for licensed cosmetology schools, and the apprenticeship program includes: shampooing of all kinds, hair coloring, bleaches, rinses, hair cutting and shaping, permanent waving and relaxing, hair setting, pin curls, fingerwaves, thermal curling, combouts and hair styling techniques, scalp treatments and scalp diseases, facials, eyebrows and arches, manicuring, hand and arm massage and treatment of nails, cosmetic chemistry, salesmanship and shop management, sanitation and sterilization, anatomy, state law, and additional optional topics selected by the schools. See § 329.040.4 RSMo.

The cosmetology exam (like the barbering exam, discussed below) is developed by an independent third party contractor, called Professional Credential Services, Inc. ("PCS"), which administers the National Interstate Council's cosmetology and barber licensing exams. (PSOMF Id. at ¶ 143-44) The Board does not select or control the content of the cosmetology (or barbering) exam, other than by contracting with PCS to administer the exam. (Id. at ¶ 148) The

discussed later, there is an exemption for braiders at public amusement and entertainment venues. See RSMo. § 316.265.

exam consists of 110 questions, only 100 of which are scored. The content of the written exam is drawn from material contained in two of the main textbooks used in cosmetology schools—the Milady textbook, and the Pivot Point textbook.[6] (Id. at ¶¶ 149, 154, 156)

The facts demonstrate that these two textbooks focus on traditional, mainstream cosmetology, and do not contain specific instruction on ASHB. (Id. at ¶¶ 252-54) In fact, less than 50 pages of the nearly 3,000 pages of the Milady and Pivot Point cosmetology (and barber) textbooks contain information about any kind of braiding. (Id. at 254) Even when the textbooks do discuss braiding, it is not focused on ASHB, but instead, on traditional braiding which is outside of the scope of services normally provided by Plaintiffs and other ASHB practitioners. (Id. at 256) Because the content of these textbooks form the basis of the licensing exams, the facts show that only a small percentage of the licensing exam focuses upon hair braiding.

As to the barbering statute, according to Missouri law, a barber is anyone who "is engaged in the capacity so as to shave the beard or cut and dress the hair for the general public." § 328.010(1) RSMo. Section 328.020, meanwhile, provides that it is "unlawful for any person to practice the occupation of a barber in this state, unless he or she shall have first obtained a license." The unlicensed practice of barbering is a class C misdemeanor. See § 328.160 RSMo.

In order to become a licensed Missouri barber, an applicant must complete a written and practical exam pursuant to §§ 328.070-328.080 and 20 CSR[7] 2085-5.010(10). In order to sit for the barbering exam, an applicant must: (1) study for no less than 1,000 hours in a period of not less than six months in a licensed barber school under the direct supervision of a licensed

_____

[6] The majority of Missouri cosmetology and barber schools use the Milady or Pivot Point textbooks. (ECF No. 49-13 at 452)

[7] "CSR" stands for Missouri Code of State Regulations.

instructor; or (2) complete no less than 2,000 hours under the direct supervision of a licensed barber apprentice supervisor.  See § 328.080 RSMo.

The mandatory curriculum for licensed barbers schools, and the apprenticeship program include:  history, professional image, bacteriology, sterilization, sanitation, and safe work practices; implements, tools and equipment; properties and disorders of the skin, scalp, and hair; treatment of hair and scalp, along with facial massage and treatments, shaving, haircutting, hairstyling, mustache and beard designs, permanent waving, chemical hair relaxing and soft curl permanents, hair coloring, hairpieces, chemistry, anatomy, physiology, salesmanship, establishment management, and state law.  See 20 CSR § 2085-12.030.  The mandatory barbering curriculum does not appear to include any specific ASHB instruction, and the barbering exam has very few questions directly relevant to hair braiding.

Missouri currently licenses 97 schools of barbering and cosmetology.  (Defendants' Statement of Uncontroverted Material Facts at ¶ 17) ("DSOMF")  Total tuition (for all 1500 hours) at a licensed Missouri cosmetology/barber school costs between $3,800 and $21,450, with an average of $11,570.  (ECF No. 49-47 at 1; PSOMF at ¶ 157)

### 3)  Application of State Licensing Laws to African Style Hair Braiders

As discussed above, and as agreed by the parties in this lawsuit, the Board has determined that the practice of ASHB falls within the statutory definition of either cosmetology or barbering, and therefore, all those practicing ASHB must be licensed as cosmetologists or barbers.  (PSOMF at ¶¶ 120, 133; ECF No. 35 at ¶ 31)

As a result of this determination, the Board has undertaken several enforcement actions against practitioners of ASHB in Missouri operating without a license.  (ECF No. 49-4 at 12-13) See, e.g., State Board of Cosmetology and Barber Examiners v. Salimato Kouyate, d/b/a African

Sisters Hair Braiding, Case No. 09-1544 CB; and State Board of Cosmetology and Barber

Examiners v. Anani Kodjo Adzoh and Ayawa Fiadonou, d/b/a/ Pauline African Hair Braiding,

Case No. 10-1753 CB.[8]  In its response to interrogatories, Defendants acknowledged at least 18

enforcement actions in the ASHB context.  (ECF No. 49-4 at 12-13)  The punishment in these

cases has usually been in the form of discipline against the license of the businesses, due to the

presence of unlicensed individuals providing ASHB services.  There appear to have been no

criminal prosecutions brought against unlicensed practitioners.

Defendants—pursuant to their inspection regime—have presented evidence from two

Board inspectors who have inspected ASHB establishments.  (ECF No. 48-13 at 10-18; and ECF

No. 48-14 at 7-17)  In at least some instances, inspectors have found sanitation violations at

ASHB establishments, including unpackaged hair left out, unclean work areas, trash and hair on

the floor and general uncleanliness in the salons.  (Id.)  It appears that these enforcement actions

were undertaken in response to complaints filed against these establishments.[9]  (ECF No. 49-13

at 310-313)

### B.  Procedural History

On June 16, 2014, Plaintiffs filed a three-count complaint against Emily Carroll

("Carroll"), Executive Director of the Missouri Board of Cosmetology and Barber Examiners

("Board"), in her official capacity.  (ECF No. 1)  Plaintiffs also sued six Board members in their

_____

[8] The hearing decisions for these cases, and several others like it, can be found online at the Missouri Board of Cosmetology and Barber Examiner's website, in the discipline section: http://pr.mo.gov/cosbar-discipline.asp (last visited on September 15, 2016).  Although these hearing decisions were not entered into the record, the Court takes judicial notice of the fact that these enforcement actions occurred.  See American Prairie Const. Co. v. Hoich, 560 F.3d 780, 798 (8th Cir. 2009) (permitting district courts to take judicial notice of facts outside the record where "the facts are matters of common knowledge or are capable of certain verification").

[9] Some of these complaints have apparently been filed by licensed competitors of the unlicensed practitioners.  (ECF No. 49-13 at 317-19)  It is not clear what percentage of the complaints is filed by competitors, and what percentage is filed by customers.

official capacities (collectively, "Defendants").[10]  On April 15, 2015, Plaintiffs filed an Amended

Complaint, in which they added references to the State's barbering license, because Defendants

determined during the course of discovery that Plaintiffs could be regulated under the barbering

regime in addition to the cosmetology licensing regime.  (ECF Nos. 30, 36)

In Count I of the Amended Complaint, Plaintiffs allege that enforcement of either the

cosmetology or barber licensing regime against them violates their right to substantive due

process by violating their "right to earn a living."  (ECF No. 36 at 28-29)  Plaintiffs claim that

forcing them to undergo "at least 1,500 hours of irrelevant cosmetology training or at least 1,000

hours of irrelevant barbering training" is not rationally related to any legitimate government

interest.  (Id. at 29)  In Count II, Plaintiffs claim that the licensing regime deprives them equal

protection of the law, in violation of the Fourteenth Amendment, arguing that "the right to equal

protection protects not just similarly situated people from being treated differently, but also

differently situated people from being treated similarly."  (ECF No. 36 at 30)  Plaintiffs claim

that they "cannot be subject to the same regulations and licensing requirements as cosmetologists

or barbers."  (Id.)  In Count III, Plaintiffs allege that the licensing regime violates the Privileges

or Immunities Clause of the Fourteenth Amendment, which they claim "protects the right to earn

a living in the occupation of a person's choice subject only to reasonable government

regulation."  (ECF No. 36 at 31)

Plaintiffs seek declaratory and injunctive relief.  They want:  (1) a declaratory judgment

that application of the Missouri licensing regime to Plaintiffs and ASHB practitioners generally

---

[10] These six individuals were Wayne Kindle, Betty Leake, Jackie Crow, Joseph
Nicholson, Leata Price-Land, and Lori Glasscock.  (See ECF No. 1 at 1)  On November 25,
2014, Defendants gave notice to the Court that Betty Leake was no longer a member of the
Board, due to the expiration of her term in office.  (See ECF No. 25 at 1)  Under Fed. R. Civ. P.
25(d), Linda M. Bramblett, Leo D. Price, Sr., and Christie L. Rodriguez are substituted as
parties, because they have been named to terms on the Board.  (Id.)

is unconstitutional;[11] (2) a permanent injunction prohibiting Defendants from enforcing the licensing regime against Plaintiffs and ASHB practitioners generally; and (3) attorneys' fees, costs, and expenses in the action, pursuant to 42 U.S.C. § 1988.  (ECF No. 36 at 32-33)

On September 30, 2015, after completion of discovery, the parties filed cross-motions for summary judgment.  (ECF Nos. 47, 49)  Concurrent with their motions for summary judgment, the parties also filed proposed statements of uncontested material facts.  (ECF Nos. 48-1 and 49-2)  On October 30, 2015, both parties filed briefs in opposition to the other party's motion.  (ECF Nos. 51, 52)  On November 11, 2015, both parties filed replies in support of their respective motions for summary judgment.  (ECF Nos. 53, 54)

As discussed above, after briefing was complete, the Court ordered oral argument from the parties concerning their respective motions for summary judgment.  (ECF No. 55)  The Court heard oral argument on January 19, 2016.

At oral argument, the Court discussed with the parties the fact that multiple bills had been proposed in the Missouri Legislature which would have altered the licensing requirements for hair braiders in Missouri, and potentially mooted the case.  The Court therefore entered an order staying the case until the end of the 2016 legislative session, or passage of one of the licensing bills.  (ECF No. 57)  At the end of the 2016 legislative session, however, no bill had been passed by the legislature mooting this controversy.  Therefore, on May 27, 2016, the Court lifted the

---

[11] Plaintiffs appear to intend their lawsuit as a facial challenge.  (See ECF No. 36 at 32-33) (asking for relief vindicating the rights of African Style Hair Braiders *generally*).  Plaintiffs did not bring this case as a class action under Fed. R. Civ. P. 23, however, and lack standing to assert claims or to seek relief on behalf of other ASHB businesses who are not before the Court. See generally United States v. Raines, 362 U.S. 17, 21-23 (1960).  Therefore, the Court considers Plaintiffs' suit to be an as-applied challenge and only rules on the factual circumstances presented in this case.

temporary stay in this matter, and took the matter under submission. (ECF No. 62) The matter is now fully briefed and ready for disposition.

## II. __Summary Judgment Standard__

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence of some alleged factual dispute." Anderson, 477 U.S. at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. Id. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

The Court must construe all facts and evidence in the light most favorable to the non-movant, and must refrain from making credibility determinations and weighing the evidence. Id. at 255. "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." Progressive Cas. Ins. Co. v. Morton, 140 F. Supp.3d 856, 860 (E.D.Mo. 2015) (citations omitted).

## III. <u>Discussion</u>

As noted above, Plaintiffs claim that application of the Missouri cosmetology and barbering statutes to them violates their Fourteenth Amendment rights to substantive due process, equal protection of the law, and their privileges or immunities. The Court will address these claims in reverse order for the sake of clarity and narrowing the issues. As an initial matter, however, the Court addresses the preliminary issue of standing, which the parties have not discussed. This inquiry is important because Plaintiffs have not yet been harmed, but instead are alleging hypothetical threats that they will be harmed in the future.

### A. <u>Standing</u>

Although the parties do not contest that this Court has subject matter jurisdiction, the Court is under an independent obligation to assure itself that it has subject matter jurisdiction. <u>Arbaugh v. Y&H Corp.</u>, 546 U.S. 500, 514 (2006). That means the Court must inquire as to Plaintiffs' standing, and the suitability of this controversy for judicial review. <u>See</u> <u>also</u> <u>Bernbeck v. Gale</u>, --F.3d--, 2016 WL 3769481 at *2 (8th Cir. July 14, 2016) (noting that even where it is not raised by the parties, standing is "'a threshold issue that [the Court is] obligated to scrutinize,' sua sponte if need be") (internal citations omitted).

This independent obligation to ensure justiciability arises because the federal courts are tribunals of limited jurisdiction. <u>See</u> <u>Kokkonen v. Guardian Life Ins. Co. of America</u>, 511 U.S. 375, 377 (1994). For instance, Article III of the Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." <u>See</u> U.S. Const., Art. III, § 2. The standing doctrine gives meaning to this limitation by identifying those disputes which are appropriately resolved through the judicial process. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992). To establish Article III standing, a plaintiff must show: (1) an injury in fact; (2) a sufficient causal

connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision. Id. at 560-61.

There is no doubt that Plaintiffs have alleged a sufficient injury in theory: deprivation of their livelihood, fines, or even criminal conviction for the unlicensed practice of cosmetology or barbering counts as injury. Cf. Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2343 (2014) (holding that the threat of criminal and civil enforcement of a prohibition against false statements in an election campaign is a cognizable injury in fact). But the Court must determine not merely whether the type of injury that Plaintiffs allege is sufficient, but whether—because this is a threatened *future* injury—the threatened injury is "certainly impending," or there is a "substantial risk" that the harm will occur. See Clapper v. Amnesty International, 133 S. Ct. 1138, 1147, 1150, n. 5 (2013). This inquiry is necessary because federal courts do not adjudicate issues of hypothetical harm that may or may not occur in the future. See id. at 1143 (holding that a future injury must be "certainly impending" in order to establish Article III standing).

In this regard, "it is not necessary that the plaintiff first expose h[er]self to actual arrest or prosecution to be entitled to challenge the statute that [s]he claims deters the exercise of h[er] constitutional rights." Babbitt v. United Farm Workers Na. Union, 442 U.S. 289, 298 (1979) (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)) (alterations in original omitted). Instead, when "the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, [s]he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" Babbitt, 442 U.S. at 298. (quoting Doe v. Bolton, 410 U.S. 719, 188 (1973)). Only "persons having no fears of state prosecution except those that are imaginary or speculative," lack standing. Id. In analyzing the probability of future

prosecution, courts look to evidence of enforcement in the past.  Susan B. Anthony List, 134 S.

Ct. at 2345 ("We have observed that past enforcement against the same conduct is good evidence

that the threat of enforcement is not 'chimerical.'") (quoting Steffel, 415 U.S. at 459).

Here, Plaintiffs have sufficiently proved standing.  It is uncontested that the prohibition

on the unlicensed practice of cosmetology or barbering carries the risk of criminal and civil

penalties.[12]  Although no *criminal* prosecutions appear to have been brought, Defendants have

regularly engaged in civil enforcement proceedings, stripping establishments of their licenses

due to the presence of unlicensed practitioners on their premises, and Plaintiffs have either an

ownership interest in, or are employed by similar establishments.  As discussed above,

Defendants have admitted to at least eighteen enforcement actions over the last several years

against hair braiders and establishments where ASHB is provided.  (ECF No. 49-4 at 12-13)  The

past record of enforcement of Missouri's licensing requirements is sufficient to indicate that

Plaintiffs face a sufficiently likely enforcement action in the future to satisfy Article III standing

requirements.  Susan B. Anthony List, 134 S. Ct. at 2345.[13]

Therefore, because Plaintiffs have established standing, and this case is ripe for judicial

disposition, the Court will now turn to the merits of the parties' motions.  The Court will first

---

[12] It is also uncontested that the practice of ASHB falls within the statutory definition of cosmetology.  Plaintiffs do not argue that the State incorrectly applied the statutory definition of cosmetology or barbering to ASHB; they argue instead that it is constitutionally impermissible to subject ASHB to the licensing requirements of the cosmetology and barbering statutes.

[13] Also, there is no question that the "causation" and "redressability" elements of standing are met as well:  the purported injury is *caused* by enforcement of the licensing regimes, and there is sufficient *redressability* if this Court finds that the licensing regime is unconstitutional— the Court can enjoin enforcement of the regime against Plaintiffs.  And finally, there is no ripeness issue in this case.  Although cases of future injury usually require a ripeness inquiry, in cases like this "Article III standing and ripeness issues … 'boil down to the same question:'" whether the controversy is ready for judicial review.  Susan B. Anthony List, 134 S. Ct. at 2341, n. 5.  This is because the "doctrines of standing and ripeness 'originate' from the same Article III limitations."  Id. (quoting DiamlerChrysler Corp. v. Cuno, 547 U.S. 332, 335 (2006)).  In cases such as this, there is no ripeness inquiry separate from the standing inquiry.

dispose of Plaintiffs' Privileges or Immunities Clause claim, and then review Plaintiffs' Equal Protection Clause and Substantive Due Process Clause claims.

**B.  Privileges or Immunities Clause (Count III)**

Plaintiffs allege that application of the licensing regime to them violates the Privileges or Immunities Clause of the Fourteenth Amendment, because it "unreasonably" restricts their "right to earn a living in the occupation of [their] choice subject only to reasonable government regulation."  (ECF No. 36 at 31)  Plaintiffs acknowledge, however, that this claim is foreclosed by the Slaughter-House Cases, 83 U.S. 36 (1872) (holding that the Privileges or Immunities Clause only protects those rights which owe their existence to the federal government, and that the right to practice a profession of one's choice is not a federal right, but is left to the state government for protection and security).  (ECF No. 49-1 at 7)  Plaintiffs simply wish to preserve their Privileges or Immunities Clause claims for potential Supreme Court review.  (ECF No. 49-1 at 7)  The Court therefore grants summary judgment to Defendants on Count III.

**C.  Equal Protection Clause (Count II)**

Next, the Court must decide whether Plaintiff's Equal Protection Clause argument is properly before the Court.  Plaintiffs have pleaded an equal protection count, but Defendants argue that Plaintiffs are asking for an unwarranted extension of equal protection doctrine, and that Plaintiffs have—in substance—articulated only a substantive due process theory.  (ECF No. 52 at 7-9)  Plaintiffs respond by arguing that their equal protection claim is distinct from the due process claim.  (ECF No. 54 at 8-12)  Plaintiffs argue that ASHB is not the same occupation as cosmetology or barbering, and that it violates the Equal Protection Clause to regulate them as if they were traditional cosmetologists or barbers.  (Id.)  Plaintiffs claim that the "guarantees of Equal Protection under the Fourteenth Amendment protect not only similarly situated individuals

from disparate treatment, but also differently situated individuals from similar treatment." (ECF No. 49-1 at 9) Plaintiffs conclude that, because the State of Missouri did not differentiate in licensing between traditional cosmetologists, and African Style Hair Braiders, the State has violated the Equal Protection Clause.

In support of their equal protection argument, Plaintiffs rely mainly on Jenness v. Fortson, 430 U.S. 431, 442 (1971), as well as decisions from two federal district courts in other states which have agreed with Plaintiffs that the Equal Protection Clause is implicated in ASHB licensing. See Cornwell v. Hamilton, 80 F. Supp. 2d 1101, 1103 (S.D. Cal. 1999) (holding that Plaintiff's equal protection argument was properly before that court); and Clayton v. Steinagel, 885 F. Supp. 2d 1212, 1214 (D. Utah 2012) (same).[14] Defendants, on the other hand, deny that Plaintiffs have adequately alleged an Equal Protection Clause claim. (ECF No. 52 at 5-9) Defendants argue that the idea that equal protection is violated by treating people similarly is a unique interpretation of the Equal Protection Clause, not supported by case law, and a "distraction" from the main issue in the case, which is the substantive due process claim. (Id. at 9)

---

[14] Plaintiffs also cite Brantley v. Kuntz, 98 F. Supp. 3d 884, 893 (W.D. Tex. 2015), for the proposition that it is impermissible to "shoehorn" two unlike professions into one licensing scheme. See id. (quoting Clayton and Cornwell). Brantley does not help Plaintiffs' equal protection argument. In Brantley, the district court held that certain requirements for barbering schools could not be applied to an African Style Hair Braider who taught ASHB in her establishment and wanted to be considered a barbering "school." The court said that the minimum requirements [to be considered a licensed barbering school] could not be applied to the plaintiff in that case because they were not "logically connecting means and ends," and instead were "shoehorn[ing] two unlike professions into a single, identical mold." This was a substantive due process holding, however. Earlier in the opinion, the court noted that it had *expressly dismissed* the equal protection claim in an earlier decision. Id. at 888. In that earlier decision, the same court explained that the plaintiff's "equal protection claims are not equal protection claims at all, but are merely strained attempts to reframe her due process arguments." See Brantley v. Kuntz, 2013 WL 6667709 at *5 (W.D. Tex. Dec. 16, 2013).

The Court agrees with Defendants.  Plaintiffs are asking for an extension of equal protection doctrine that has no support in controlling case law, inverts the traditional understanding of equal protection jurisprudence, and is largely irrelevant because the rational basis inquiry under the substantive due process framework is identical to that which Plaintiffs propose under equal protection guise.

First, the Court agrees with Defendants that there is no controlling case law supporting Plaintiffs' position.  Plaintiffs rely almost exclusively on one sentence of dicta at the end of Jenness where the Supreme Court said that "[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."  Jenness, 403 U.S. at 442. This statement, however, is taken out of context, and is unrepresentative of the actual holding of the case.

At issue in Jenness was a Georgia election law that required a nominee of a "political body" (i.e., a third party) to secure the signatures of 5% of the eligible voters for that office at the last election before their name would be printed on the official ballot.  Id. at 433.  This signature requirement did not apply to nominees of the Democratic or Republican parties, and had the effect of limiting ballot access to nominees of the major parties.  Various third party candidates attacked that law, claiming that the law illegally discriminated against them by requiring them to secure the signatures of 5% of the voters before printing their names on the ballot, yet automatically printing the names of the Republican or Democratic nominees.  The third parties argued that it violated the Equal Protection Clause to treat them differently.

The Supreme Court rejected that challenge, noting that Georgia had good reason to treat third party nominees differently than the nominees of the Republican and Democratic parties, due to "obvious differences in kind between the needs and potentials" of the two established

parties as opposed to newer third parties.  Id. at 441.  The Court went on to state that "Georgia has not been guilty of invidious discrimination in recognizing these differences and providing different routes to the printed ballot.  Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."  Id. at 441-42.  Thus, it is apparent that the holding of the Supreme Court was that Georgia did not violate equal protection principles by treating groups *differently*.  The Court then speculated that it was a good thing that Georgia treated the two groups differently because it would have been unfair to treat them the same.  This speculation, appearing in the second-to-last paragraph of the opinion, is dicta. Jenness does not support Plaintiffs' argument that equal protection principles *require* people to be treated unequally if they are differently situated.

Plaintiffs dispute this reasoning by arguing that the Court in Jenness "found no equal protection violation **precisely because** differently situated individuals were **not** treated as if they were the same."  (ECF No. 54 at 9) (emphasis in original)  That is not accurate—the Supreme Court held that there were good reasons for treating the two types of parties differently.  In other words, the Supreme Court did not hold that Georgia was *constitutionally mandated* to treat the two types of parties differently—merely that it was *constitutionally permissible* to do so.

The only additional case law that Plaintiffs cite in support of their equal protection arguments comes from the other ASHB cases in two other district courts:  Clayton and Cornwell. The problem, however, is that Clayton (the Utah case), from 2012, simply cites to Cornwell (the California case), from 1999, with no independent analysis as to how the Equal Protection Clause applies.  See Clayton, 885 F. Supp. 2d at 1214 ("Review of both Plaintiff's Due Process and Equal Protection claims must be based on the rational relation test…. Courts have also made it

clear that a state may not treat persons performing different skills as if their professions were one and the same.") (citing Cornwell).

The Cornwell court, in turn, simply cites to the Jenness case, for the proposition that treating two entities *equally* can violate equal protection principles. See Cornwell, 80 F. Supp. 2d at 1103 ("Plaintiff's Equal Protection claim is grounded on the reasoning that 'sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.'"). Cornwell does not critically analyze Jenness. As discussed above, this language from Jenness is dicta, and does not stand for the proposition for which Plaintiffs cite it. This Court declines to follow the Cornwell court's truncated reasoning.

More importantly, perhaps, the Ninth Circuit overturned the Cornwell court's equal protection analysis in Merrifield v. Lockyer, 547 F.3d 978, 985 (9th Cir. 2008). In Merrifield, a pest-controller who engaged in a specific type of pest control challenged the application of California's pest control license requirements. The plaintiff there engaged in "non-pesticide animal damage prevention and bird control," as opposed to most pest-controllers, who used pesticide-based practices. Id. at 980. The plaintiff claimed that he should be exempt from such license requirements because he did not use pesticides. The plaintiff argued that treating him the same as pesticide-based pest controllers violated his rights to equal protection, citing Cornwell. Id. at 984.

The Ninth Circuit responded by criticizing Cornwell's equal protection analysis in precisely the same way discussed above. It noted that in Jenness, "the challenged laws imposed *different* requirements on two different groups, traditional and new political parties. However, in Cornwell, the challenge was by an African hair stylist who challenged a *uniform* licensing

scheme." Id. at 985 (emphasis in original).  The Ninth Circuit concluded that "the reasoning of the district court in Cornwell … cannot survive equal protection analysis."  Id.

In sum, Plaintiffs' reliance upon Jenness, Cornwell, and Clayton for the proposition that equal protection principles *require unequal treatment* in certain situations is unsupported by any controlling or persuasive case law.[15]

Finally, even if the Court were inclined to hold that Plaintiffs had alleged a viable equal protection argument, it is unclear what such an analysis would add, because both parties agree that this Court should undertake a rational basis review.  This review is the same level of scrutiny under the Due Process and Equal Protection Clauses.  See, e.g., Independent Charities of America, Inc. v. State of Minn., 82 F.3d 791, 798 (8th Cir. 1996) (noting that "a statute which satisfies the rational basis test in an equal protection analysis also satisfies the rational basis test under substantive due process analysis"); see also Kansas City Taxi Cab Drivers Ass'n, LLC v. City of Kansas City, Mo., 742 F.3d 807, 809 (8th Cir. 2013) (hereinafter "Kansas City Taxi") ("A rational basis that survives equal protection scrutiny also satisfies substantive due process analysis.") (quoting Executive Air Taxi Corp. v. City of Bismark, N.D., 518 F.3d 562, 569 (8th Cir. 2008)).

At bottom, Plaintiffs' main concern is *not* that they are being treated *differently*, in violation of equal protection principles, but that they are suffering an unconstitutional barrier to practice their profession—this is a substantive due process claim.  See Merrifield, 547 F.3d at

---

[15] The Brantley court, which is cited by Plaintiffs, characterized Plaintiffs arguments as "essentially a reverse equal protection claim."  See Brantley, 2013 WL 6667709 at *4.  This type of claim is impermissible under Fifth Circuit precedent.  See Rolf v. City of San Antonio, 77 F.3d 823, 828 (5th Cir. 1996) ("We may conduct an equal protection inquiry *only* 'if the challenged government action classifies or distinguishes between two or more relevant groups.'") (emphasis added).  This inversion of equal protection principles is also impermissible in the Tenth Circuit.  See Powers v. Harris, 379 F.3d 1208, 1215) (10th Cir. 2004) ("[E]qual protection only applies when the state treats two groups, or individuals, differently.").

985.  For the foregoing reasons, the Court holds that Plaintiffs have not proved a viable equal protection claim.  The Court grants summary judgment to Defendants on Count II.

### D. **Substantive Due Process (Count I)**

#### 1) **Rational Basis Standard of Review**

The heart of Plaintiffs' lawsuit is their substantive due process claim in Count I. Plaintiffs allege that the State of Missouri has imposed unreasonable restrictions on their right to practice the profession of their choice.  This is a substantive due process claim.  See Merrifield, 547 F.3d at 985.

Substantive due process claims are evaluated under the "rational basis" test when they do not involve "suspect" classifications, such as racial or gender classifications, and where the restrictions at issue do not implicate fundamental rights.  See Romer v. Evans, 517 U.S. 620, 631 (1996) (holding that "if a law neither burdens a fundamental right nor targets a suspect class," rational basis review applies); see also Kansas City Taxi, 742 F.3d at 809 (applying rational basis review to an ordinance regulating permits to drive taxi cabs).  Both parties agree that this case does not involve suspect classifications, or fundamental rights, and both parties agree that the rational basis test applies.  (ECF Nos. 49-1 at 3 and 48 at 5-6)  Under rational basis review, government laws must be rationally related to a legitimate government interest.  Romer, 517 U.S. at 631.

Rational basis review has been called a "paradigm of judicial restraint."  F.C.C. v. Beach Communications, 508 U.S. 307, 314 (1993) ("Beach").  A regulation survives rational basis review "if there is *any reasonably conceivable state of facts* that could provide a rational basis for the classification."  Id. at 313 (emphasis added).  Rational basis review "is not a license for courts to judge the wisdom, fairness or logic of legislative choices."  Id.  Where there are

*plausible* reasons for the legislature's action, a court's inquiry "is at an end." Id. at 313-14. This restraint flows naturally from the structure and history of the Constitution, which "presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted *no matter how unwisely we think a political branch has acted*." Id. at 314 (emphasis added).

Furthermore, courts may not strike down a law under rational basis review simply because that law may not succeed in bringing about the result it seeks to accomplish, Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 50 (1966) (abrogated on other grounds by Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573, 584 n. 6 (1986)), or because the problem could have been addressed in some other way. See Mourning v. Family Publications Service, Inc., 411 U.S. 356, 378 (1973). Indeed, courts may not strike down a statute even when no empirical evidence supports the assumptions underlying the legislative choice. See Vance v. Bradley, 440 U.S. 93, 110-11 (1979).

These limitations exist because such regulations are not "subject to courtroom fact-finding." Beach, 508 U.S. at 315. In other words, Plaintiffs bear the burden of discrediting "*every conceivable basis* which might support [the regulation] *whether or not the basis has a foundation in the record*." Heller v. Doe, 509 U.S. 312, 320-21 (1993) (emphasis added). So long as the law does not burden fundamental rights or single out suspect classes, the State of Missouri is free to engage in "rational speculation unsupported by evidence." Beach, 508 U.S. at 315.[16] Whether the regulation is wise or not is a judgment reserved to the Missouri legislature, because our Constitution allocates policy making authority in the economic realm to elected

---

[16] It is important to reiterate that the parties do not contend that the law singles out a suspect class, and both parties agree that rational basis review applies.

officials, not federal judges.  Cf. National Federation of Independent Business v. Sebelius, 132 S.

Ct. 2566, 2577 (2012) ("NFIB").

### 2)  Analysis

Given the judicial deference mandated by rational basis review, the Court must uphold

the licensing regime because the State has advanced at least two legitimate state interests, and the

means chosen by the State to advance those interests (the licensing regime) are at least rationally

related to those interests.  The Court will take both of those points in turn.

The State argues that it is regulating in furtherance of its interests in promoting the public

health and protecting consumers.  (ECF No. 48 at 8-10)  Both parties stipulate that these are

legitimate state interests, and the Court agrees.  See Hughes v. Oklahoma, 441 U.S. 322, 337

(1979) (recognizing health and safety to be a legitimate governmental interest); see also Turner

Broadcasting System v. FCC, 520 U.S. 180, 189-90 (1997) (finding consumer protection to be a

legitimate governmental interest).  Therefore, the issue is whether Plaintiffs can meet their

burden to prove that there is *no conceivable set of facts* which would support the means chosen

by the State to achieve these purposes.  See Beach 508 U.S. at 313.

Plaintiffs make several arguments in an attempt to meet this burden.  These boil down

into two categories of argument.  First, Plaintiffs argue that the practice of ASHB is safe, and

does not significantly impact the State's interest in public health.  Second, Plaintiffs argue that—

even if there is some "minimal" connection between ASHB and the public health, or some small

issue with consumer protection—the licensing regime is constitutionally infirm because it fails to

promote those interests.  (ECF No. 49-1 at 15)  This in turn is because the licensing regime was

"not designed for African-style hair braiding," and it has "no requirements specific to African-

style hair braiding," along with the fact that Missouri barber and cosmetology schools do not

offer instruction in ASHB.  (Id. at 14)  Finally, Plaintiffs argue that—given how unrelated the training is to the practice of ASHB—the cost of obtaining a license is "particularly onerous," and the State could accomplish their legitimate interests in other ways, such as normal business inspection regimes, and general state consumer fraud statutes.  (Id. at 26-27)

Defendants respond by conceding that the licensing regime at issue in this case was developed without consideration of ASHB, and that it does not specifically prepare trainees to engage in the practice of ASHB.  But Defendants argue that the practice of ASHB implicates broader, traditional public health, sanitary, safety, and business practice issues, and that cosmetology and barber training teaches these broader skills.  Therefore, Defendants argue that—given the deference that the Missouri legislature is due under the rational basis test—the means chosen by the State to achieve its legitimate interests are permissible.

The Court agrees with Defendants, and holds that Plaintiffs have not met their burden to demonstrate that there is no *reasonably conceivable state of facts that could provide a rational basis* for the regulation.  Beach, 508 U.S. at 313.  The record demonstrates that issues of public health and consumer protection are present, and that the licensing regime at least minimally promotes those interests.  Also, the regulation could conceivably promote other legitimate state interests.  Therefore, the Court must uphold the license requirement.  Id. at 313-14.

First, it is clear that the practice of ASHB implicates traditional public health concerns. The evidence in the record shows that—even if chemicals are not used in hair arranging and dressing—ASHB presents general concerns of sanitation, the effects of prior or parallel use of chemicals, instrument sterilization, disease recognition and control, long-term scalp damage, and other health and safety concerns which are just as much involved in African-style hair braiding as in any other hair arranging and dressing technique.  (See, e.g., ECF No. 48-11 at 2) (Dr.

Dakara Rucker Wright, M.D., discussing the fact that "hair braiding can also potentially damage hair follicles deep in the scalp and hair shaft," and noting that she "disagree[s] that because chemicals are not used in African-style braiding, there are no significant health concerns relating to such practice"); (see also ECF No. 48-10 at 10) (Dr. Raechele Gathers, M.D., noting that improper braiding techniques, especially when used on children, "could permanently impact the child's ability to grow future hair, and could also lead to devastating infections that can cause both physical and psychological harm"); (see also ECF No. 49-4 at 4) (listing scientific and legal publications discussing public health and regulatory issues surrounding hair braiding and issues of scalp health, especially in African-American clientele).

 Plaintiffs respond by contesting the accuracy of these assertions that ASHB implicates serious health risks.  (See ECF No. 49-1 at 1) (describing ASHB as "all-natural" hair care that does "not use harmful chemicals").  But it is not the proper role of this Court to second-guess the wisdom of the State's decision to favor one form of disputed evidence over another, especially where the State does not even have an affirmative duty to submit evidence supporting its decision.  See Beach, 508 U.S. at 315 (holding that a legislative choice may be based on rational speculation unsupported by evidence or empirical data).

 A recent decision from the Court of Appeals for the Second Circuit is illustrative of this point.  At issue in Sensational Smiles, LLC v. Mullen, 793 F.3d 281, 285 (2nd Cir. 2015) cert. denied, 136 S. Ct. 1160 (2016), was a rule requiring that a process involved in teeth whitening— shining an LED light into a patient's mouth—be performed by a licensed dentist.  Plaintiffs, who were non-dentist teeth whiteners challenging this rule, proffered expert testimony from medical doctors that there were absolutely no health risks associated with non-dentists shining LED lights into patients' mouths.  Defendants, on the other hand, did not introduce *any* admissible evidence

to show that there was a bona fide medical risk in allowing non-dentists to shine LED lights into a patient's mouth. But the record contained a few equivocal mentions of (non-admissible) evidence that there *might* be *some* health risks associated with shining LED lights into patients' mouths. Id. at 284-85. This was enough for the Second Circuit to uphold the Connecticut rule limiting teeth whitening to licensed dentists, because that court held that it is not the job of a federal court to weigh Connecticut's evaluation of disputed evidence. Id. at 285.

In this case, Defendants have made a much stronger showing of potential public health issues than did the State of Connecticut in Sensational Smiles, with the testimony of Dr. Rucker Wright and Dr. Gaethers, mentioned above. (See ECF Nos. 48-11 and 48-10) This evidentiary showing regarding the potential public health implications of ASHB is more than sufficient to withstand rational basis review. Again, it is not this Court's job to adjudicate the weighing of evidence. It is enough that the State has a "conceivable" basis for regulating, and indeed, the State does not even have a duty to affirmatively proffer facts in support of its legislative choice. See Beach, 508 U.S. at 315 (holding that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data").

Furthermore, Plaintiffs and their own experts admit that hair braiders often discuss traditional cosmetology services when serving their own clients. For instance, Plaintiff's expert witness, Pam Ferrell, who is an African Style Hair Braider, admits that in her practice, she helps "clients address the damaging effects of chemical hairdressing services performed by licensed cosmetologists and/or consumers who use hydroxide relaxer home-kits to chemically straighten the naturally curly state of their hair." (ECF No. 49-53 at ¶ 15) If hair braiders are assessing their customers' past experience with traditional cosmetology services, and advising those customers on future courses of action, the State can at least "conceivably" want these braiders

educated regarding the cosmetology methods and techniques that they are discussing with customers.  See Beach 508 U.S. at 313.

Plaintiffs here make an additional argument as well.  They argue that even if ASHB does in fact implicate health and safety concerns, the licensing regime is not a rational way to deal with those issues because the licensing regime was not designed with hair braiders in mind, the cosmetology and barbering curriculum does not prepare graduates for the practice of ASHB, and the licensing exam does not insure that practitioners of ASHB are competent in that craft.  This argument is unavailing.

For one thing, even if the cosmetology and barbering education and testing regime is inadequate in its stated goals of educating practitioners and protecting the public, that is not a sufficient reason for declaring that the law violates substantive due process.  See Gallagher v. City of Clayton, 699 F.3d 1013, 1020 (8th Cir. 2012) ("Even 'if the rationale for the law seems tenuous,' the law survives rational basis review so long as 'the legislative facts on which the law is apparently based could … reasonably be conceived to be true by the governmental decision maker.'") (internal citations and brackets omitted); see also Seagram & Sons, Inc., 384 U.S. at 50 (holding that federal courts may not strike down a law under rational basis review simply because it may not succeed in bringing about the result it seeks to accomplish).

The plaintiffs in Sensational Smiles made an analogous argument.  They argued that even if shining an LED light into a patient's mouth could conceivably implicate health concerns, the rule requiring that that process be done by a licensed dentist violated rational basis review because dentists are not taught about LED lights in dental school, and therefore, their educational background is not relevant at all to the purported rule.  Sensational Smiles, 793 F.3d at 285.

The Second Circuit held that this failure to connect the educational regime of dentists to the justification for the state rule did not violate due process. That court held that the state:

> might have reasoned that if a teeth-whitening customer experienced sensitivity or burning from the light, then a dentist would be better equipped than a non-dentist to decide whether to modify or cease the use of the light, and/or to treat any oral health issues that might arise during the procedure. The [state] might also have rationally concluded that, in view of the health risks posed by LED lights, customers seeking to use them in a teeth-whitening procedure should first receive an individualized assessment of their oral health by a dentist.

Id. The court concluded that these were "rational grounds for the [state] to restrict the use of these lights to trained dentists." Id. This reasoning is applicable to the present case. As discussed above, Plaintiffs conduct an initial examination of customers' scalp and hair before beginning the braiding process; the State could quite sensibly require that such braiders be trained in broader hair care topics such as disease recognition, biology, bacteriology, etc., before treating their customers.

Indeed, the case of Plaintiff Niang is instructive. A typical customer interaction with Niang involves Niang asking customers about any prior hair braiding experience, whether they have any scalp sensitivities or scalp conditions, and whether they have had any chemical hair treatments such as coloring, hair relaxing, or perm. (PSOMF at ¶ 78) Niang then conducts an examination of the customer's scalp and hair prior to performing any braiding. (Id. at ¶ 79) In doing these evaluations, and receiving this health information from customers, the State of Missouri could very reasonably conclude that cosmetology education is relevant.

Moreover, while the Court agrees (and Defendants concede) that much of the education and training that traditional cosmetologists and barbers undergo is not directly relevant to the narrow practice of ASHB, the educational regime includes scalp treatments and disease recognition, bacteriology, sanitation, disorders of the skin, scalp and hair, and sterilization.

(PSOMF at ¶ 129, 139)  This broader education is at least a rational connection between the State's interest and its chosen means of accomplishing that interest.

Moving from the educational aspect of the licensing regime to the testing portion, the fact that the testing regime includes few questions specifically relating to hair braiding is also not dispositive.  Cf. Merrifield, 547 F.3d at 988 (holding that a pest control license examination was not irrationally narrow where it focused on pesticide issues, but petitioner practiced pesticide-free pest control).  This is because a "licensing statute does not fail because it is not tailored to each precise specialization within a field. 'It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislature measure was a rational way to correct it.'"  Id. (quoting Williamson v. Lee Optical, 348 U.S. 483, 488 (1955)).

In sum, the various features of the Missouri cosmetology and barbering licensing regimes are at least minimally related to the State's legitimate interest in the public health, and if the State's regime is at least minimally related to the relevant interest, that satisfies the rational basis burden.  Cf. Heller, 509 U.S. at 320-21 (holding that a statute survives rational basis review unless a plaintiff can discredit "every conceivable basis which might support [the regulation] whether or not the basis has a foundation in the record").

The licensing requirement is also rationally related to the State's legitimate interest in consumer protection.  To give just a few examples, the licensure process helps the State to screen for a variety of issues such as criminal history, or whether an applicant has been disciplined in another state.  The licensing system also provides for a system of inspections of ASHB establishments.  (ECF No. 48 at 11-14; ECF No. 53 at 9-11)  These are rational means of carrying out the State's interest in consumer protection because by requiring hair braiders to

obtain a license, the State "creates a framework to monitor them and keep them accountable."

Merrifield, 547 F.3d at 988.

Plaintiffs respond by arguing that this interest is not sufficient to sustain the licensing system because a relatively small percentage of the educational curriculum is dedicated to consumer protection issues, and because there are general "consumer fraud laws, and a civil court system, to address these issues." (ECF No. 51 at 20-21) Plaintiffs' arguments are unavailing. A federal court may not strike down a law under rational basis review simply because it may not succeed in bringing about the desired result, Seagram & Sons, Inc., 384 U.S. at 50, or because the problem might have been addressed in some other even more efficient way. Mourning, 411 U.S. at 378. The State does not need to show that its chosen means will be ultimately successful, or that it has chosen the best way to accomplish its goal.[17]

Based on the undisputed facts before the Court, the State has articulated *plausible* rationales for the State's rule requiring licensure for African Style Hair Braiders, as discussed above. In addition, the Court can conceive of other plausible reasons for the licensing regime, other than the ones propounded by the State. For instance, both parties agree that the cosmetology and barbering schools in Missouri do not concentrate on ASHB. But it is certainly conceivable that the very act of requiring hair braiders to become licensed could act as an

_____

[17] Plaintiffs make a final argument that the Court would like to address: that the Missouri legislature has fatally undercut its own asserted interests in protecting the public health and consumers through a statutory exemption that exempts hair braiders at public amusement and entertainment venues from normal licensing requirements. (ECF No. 49-1 at 28-30) The Court agrees that this exemption somewhat undercuts the State's asserted interests, because the State is permitting unlicensed braiders to practice their craft on the public at entertainment and amusement venues. But this is not enough to invalidate the licensing requirement generally, because "[l]egislatures may implement their program step by step, in … economic areas," City of New Orleans v. Dukes, 427 U.S. 297, 303 (1976), and "States are accorded wide latitude [to make] rational distinctions [] with *substantially less than mathematical exactitude*." Id. (emphasis added).

incentive to the creation of more schools and coursework specifically focused upon ASHB. Indeed, the State could have attempted to stimulate the market for ASHB education by requiring hair braiders to become licensed. Likewise, it is uncontested in the record that Plaintiffs (and many other hair braiders) mostly provide only ASHB services as opposed to broader services. If these braiders were licensed, they would be able to provide more comprehensive hair care. It is conceivable that the State could attempt to incentivize hair braiders to offer more comprehensive services by requiring them to be licensed, thereby offering additional options for their customers.

In the end, whether it relates to the interests articulated by the State, or the conceivable interests discussed above, "[t]he assumptions underlying these rationales may be erroneous, but the very fact that they are arguable is sufficient, on rational-basis review, to immunize the [State's] choice from constitutional challenge." Beach, 508 U.S. at 320 (internal quotations and alterations omitted). For all of the reasons discussed above, Defendants are entitled to summary judgment on Count I.

As a final matter, this Court recognizes that at least two other federal district courts have ruled in favor of hair braiders who are similarly situated to Plaintiffs in this matter. See Cornwell v. Hamilton, 80 F. Supp.2d 1101 (S.D. Cal. 1999) (holding that application of California's cosmetology licensing regime to African hair braiders violates substantive due process and equal protection); see also Clayton v. Steinagel, 885 F. Supp.2d 1212 (D. Utah 2012) (holding that application of Utah's cosmetology licensing regime to African hair braiders violates substantive due process and equal protection).[18]

_____
[18] Indeed, the Court notes that Plaintiffs in this matter cited Cornwell and Clayton repeatedly throughout their briefing, relying on those cases for most of their substantive arguments.

The Court does not find the reasoning of those decisions persuasive because those courts engaged in a hard look at the actual connection between the State's asserted interests and how each aspect of the licensing regime advanced the State's interests in concrete ways. See, e.g., Cornwell, 80 F. Supp.2d at 1108, 1110, and 1115 (holding that California's licensing regime was irrational as applied to plaintiff hair braider because of her "limited range of activities," which over-lapped only minimally with the types of activities covered in the state's principle training curriculum and examination; holding that less than ten percent of the curriculum and eleven percent of the licensing exam were relevant to plaintiff's actual activities); see also Clayton, 885 F. Supp.2d at 1214 (following the reasoning of the Cornwell court, and holding that Utah's regime licensing hair braiders failed rational basis review where the state's educational curriculum and entrance exam overlapped only minimally with the plaintiff hair braider's actual activities). The Cornwell and Clayton courts viewed this marginal overlap between the actual practice of hair braiders and the training/testing requirements as constitutionally infirm due to overbreadth (by including within its reach persons—i.e. hair braiders—to whom the license was not relevant) and under inclusiveness (by failing to ensure the competency of hair braiders).

This type of stringent review of a state's asserted interests and how each aspect of the State's licensing regime promotes those interests is not consistent with Supreme Court case law which holds that those connections are "not subject to courtroom fact-finding." See Gallagher, 699 F.3d at 1020 (quoting Beach, 508 U.S. at 315). Furthermore, the Cornwell and Clayton courts did not consider whether there was "any conceivable set of facts" which could support the licensing requirements, as required under Beach, 508 U.S. at 313.

All of this leads the undersigned to conclude that it is not clear what standard of review the courts applied, *in fact*, in Cornwell and Clayton, but it appears to be more stringent than

rational basis review in the Eighth Circuit.  The undersigned is bound by the standard of review articulated by the Supreme Court and the Eighth Circuit in cases such as <u>Beach</u> and <u>Kansas City Taxi</u>.  Thus, although there is no doubt a commonsense persuasive force to aspects of the <u>Cornwell</u> and <u>Clayton</u> decisions, the undersigned is convinced, and therefore concludes, that those decisions would not pass muster in the Eighth Circuit if subjected to the deferential standard of review mandated by <u>Beach</u> and <u>Kansas City Taxi</u>.  The Court declines to follow the reasoning of the <u>Cornwell</u> and <u>Clayton</u> courts.

**IV. <u>Conclusion</u>**

In conclusion, this case illustrates the great deference that federal courts must show to government economic regulations under the rational basis standard.  The Court agrees that Plaintiffs do not fit comfortably within the traditional definition of cosmetologists and barbers set out under state law.  The Court need not consider whether this is a wise law, or whether it embodies sound policy.  That is a judgment reserved to the elected representatives of the people of Missouri.  <u>Cf.</u> <u>NFIB</u>, 132 S. Ct. at 2577; <u>see</u> <u>also</u> <u>Young v. Ricketts</u>, 825 F.3d 487, 495 (8th Cir. 2016) (dismissing due process and equal protection challenges to a licensing requirement, and noting that arguments that the licensing requirement is "too costly, too parochial, or fails to effectively" advance the state's interests "are legislative issues," not judicial ones).

This Court holds only that Plaintiffs have failed "to negative every conceivable basis which might support [the cosmetology and barbering regulations.]"  <u>Beach</u>, 508 U.S. at 315 (internal quotation marks and citations omitted).  Because they have failed to do so, Plaintiffs cannot prove that Defendants violated their constitutional rights by requiring that they obtain a cosmetology or barber license in order to practice their craft professionally for the public.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (ECF No. 49) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (ECF No. 47) is **GRANTED**.

A separate judgment shall be entered this day.

/s/ ***John M. Bodenhausen***
UNITED STATES MAGISTRATE JUDGE

Dated this 20th day of September, 2016